714 Williamson v. Citrix Online Give them a minute in case people want to file in and out, just wait one sec. Okay, Mr. Williamson, go ahead. Good morning and may it please the Court. The District Court's order on defendant section 101 challenge to the 840 patent found this was a close case that fell, quote, somewhere between this Court's decision and DDR Holdings, which found that claims directed to a problem unique to the internet. I have to ask, are you related to the guy? No. Okay, all right. Mr. Williamson is in the courtroom, but we are completely unrelated. I know, it has no bearing on the outcome of the case, but we tried to figure it out online, we Googled both of you, couldn't figure it out. That's a little bit scary at that part of it. Well, I will tell you, because of the history of this case, that's become a little bit more relevant given on the prior appeal from this Court. The Williamson name has become, I guess, either famous or infamous with people claiming under 112. But the District Court here found that this case fell in between this Court's decision and DDR Holdings, which found that claims directed to problems unique to the internet were patent eligible. And two other decisions of this Court that came out the other way, based on findings that the claims were directed to simply using the internet to do advertising or budget, essentially, and do financial transactions. And in the years since the District Court ruled here, this Court has had the opportunity to analyze a much broader variety of claims as to their Section 101 eligibility and routes, and has issued a number of opinions that have come out both ways. But taken together, we believe it made clear that the District Court consigned the 840 patent to the wrong side of that line. And in fact, the claims of the 840 patent clearly belong in the class of claims that are patentable because they are non-abstract. And even if there is a non-abstract, even if there is an abstract concept in those claims, and we don't believe there is, clearly the claims themselves are sufficiently inventive to claim patentable subject matter. So turning to Step 1 of Alice, the 840 is explicit that there were problems unique to pre-1998 technological solutions, technology-based distributed learning systems. And that is clear from Column 1 of the patent. That's page 50 of the appendix. A detailed list of the defects in, first, satellite or closed-circuit broadcast, the so-called studio model, that required the presenter to be in a broadcast studio with very expensive specialized hardware, and then present subject matter to disparate locations, in many cases requiring even the distance participants to go to a separate remote location or multiple locations. And that model was obviously inconvenient and it limited any sort of interactivity among the participants. Now, there were improvements based upon the burgeoning personal computer and internet technology back in the 1990s, but those computer solutions, as of 1998, required specialized software. Some of us might remember going to CompUSA, and there would be racks and racks of boxes with software. That doesn't exist anymore, of course. So to avoid hindsight bias, we have to remember that in order to have a software program, you had to get in in advance. You had to prepare. You had to know that you were going to have a certain type of program and that the presenter in whatever learning you were going to do would have a separate program. And as the patent dictates, that has compatibility problems and it lacks flexibility. The solution is detailed in the claims. The 840 patent describes a distributed learning system and a new type of server that solves those problems. It allows the presenter... Where does it describe the new server? In Claim 17. Okay. So where is the new server? Claim 17's preamble specifically describes a distributed learning server for controlling presenter and audience member computer systems that are coupled to that server. It's comprised of a number of steps that the server, its software, distributes out to the audience member computer systems. Yeah, but it just says a distributed learning server comprising and then it has a bunch of software elements. So I don't understand how that makes it some sort of special piece of machinery. This seems to me no different than the old-fashioned Allopat argument, which, by the way, I was a big fan of, but nonetheless have lost, which is that new software makes a new computer each time you run it. That seems to be what you're trying to say here. You have a new server because you're running different software on it. That means we're going to call it a distributed learning server. But it's not actually like a unique piece of hardware, correct? That is true, but we think that's... It's a standard server. That's correct. Just running this particular software. That is right. What we think transforms that from a standard or conventional server, at least under 101 jurisprudence, is just what distinguished the claims in Maskell, and that is that it was well-known to use filtering software running at two different places. But in Maskell, the distinction here that was found impenetrable was that there was an intermediate server, an intermediate filtering function, so that content on the Internet wasn't filtered, depended upon software running at the client or software running at the host, but rather in an intermediate server. And there was no claim there. In fact, all parties agreed. There was no new piece of hardware involved. But you're not taking the position that servers, that you invented servers, that allow... So Bascom seems to me to be different, because in Bascom, that filter was novel, the location of it. Putting it in a particular place and using it that way was different than what was done before. So it was a technological improvement, something more beyond the abstract idea. Here, your server, that the abstract idea is using the server in a particular environment, the learning environment. I would disagree with the court. That's one of the new and unconventional ways of doing it, but actually very similar to Bascom, that the evidence is unrebutted, that there had not been a distributed learning server where that software functionality was housed in a remote server. So it actually is the same as the outcome in Bascom. Again, filtering software was known. Distributed learning solutions were known. But the only ones that appear anywhere in the record as having existed before this patent was filed for in 1998 ran those systems on the presenter or the audience or the host or the client. So we believe that one of the two key unconventional ways in which these servers were being used was to have them at a remote distributed location. This is my concern. Let's say distributed shopping, okay? So you've got a server, and almost all the elements of the claim could be the same except that instead of the environment of learning, it's shopping, where there's actually someone displaying or modeling the clothes or what have you, and it's interactive that way. How is that any different? I mean, it's not a technological advantage in the sense that the servers change or it's different, it's improving the technology in the way that people are at the speed in which images are being sent or something like that. Instead, the technological advantage is the idea of having this more convenient virtual classroom. The difference is that the shopping experience is one-to-one. And you have to start from the idea that we're already talking about a different type of learning. Distance or distributed learning, by definition, is something that cannot happen in a store. In your example, that's really just making that store experience easier. The way I like to put it here, there isn't a bullhorn loud enough or a mountain high enough in the world to do what this invention does. It's not the sort of pre-existing human activity that you can do without a technology solution because you have multiple participants, all at the same time, connecting from different places. That's the difference. But all this claim says, really, is just if you want to accomplish distributed learning, learning that has gone on in the past, just do it on a computer. That's all it really says. We disagree, Judge Lynn. We believe that the claims as read in light of the specification as required in this Court's end-of-issue decision claim something different. Focus on Claim 1 and answer Judge Lynn's question with regard to Claim 1. Tell me what in Claim 1, which you're appealing, isn't consistent with Judge Lynn's question. Sure. It requires a plurality of computer systems coupled to a network. And then, importantly, based upon the claim construction in this case, it requires non-pre-installed code. That is, not existing software programs that the presenter and the audience members already have on the computer, but non-pre-installed code, which is the claim construction of providing to be sent to multiple participants and presenters through this distributed learning server. That non-pre-installed code includes specific limitations. There has to be a control selection module for the presenter to select the minimum of two data streams that will be sent to the audience members. Those have to be displayed simultaneously. And then the audience member computer systems, they have an additional limitation. Something you may remember from the earlier system. But all of these things, this is what computers do, and this is how computers work. You want to tie computers together, you do so under the control of a server, and there's code that says do this and do that. So it seems to me that all this claim is trying to say is that, well, here's my idea. Let's provide distributed learning using a computer system. That's it. And there is nothing, you know, EnFish-like in terms of, well, our distributor does this and this because it's a uniquely designed distributor or server, or our code does something unique. There's nothing unique here. In fact, the specification makes it perfectly clear that this whole system is made up of conventional, well-understood, ordinary pieces of computer equipment. So that leaves you in a bit of a predicament, I think, in trying to overcome some of our prior decisions on 101. Judge Lynn, we would disagree for this reason. We believe that's what the district court said and got it wrong. Just as this court has said in both EnFish and in Bascom in the recent Amdocs case, merely because there are conventional hardware components involved in that network does not by itself render the claims non-invented. And in EnFish, all of the claims was admitted related to off-the-shelf standard servers and software. And, in fact, there you were talking about something that computers do all the time, and that is render a database, a tabular database. The only difference was there was a special way to do that. There was a claim. In fact, it wasn't even the claims. In EnFish, the court relied upon a claim construction. You're spending all your time trying to show us how your case is like Bascom, DDR, and EnFish. I understand why those are the only ones that have come out, really, that are in favor of patent eligibility. And there are differences between your case and each one of those. You may not be willing to admit to it, but there are. So the question is, how does your case survive Ultramershal? How does your case survive the... There's a very, very small body of precedent that we have created that said certain things are patent eligible, even though people thought there's not. There's, unfortunately, a really, really big body of precedent that says lots of stuff that looks like this is not patent eligible. So how do you get around those? Let me take Ultramershal first. Ultramershal, which found unpatentable the concept of, essentially, offering a free viewing of a downloadable television program in exchange for watching a commercial. That is exactly the same as the pre-ALICE human interaction. When you go to a store, you get this Coke. If you agree to try this new dip with an advertising there, and if you do that and go through this advertising transaction, here's your free Coke. That's Ultramershal. Here, there's no analog in normal inhuman interaction to what these claims... No, but there was. There was, unlike BASCOM, where there was no computer, non-computer analog to what they were doing, your patent lays out in great detail here all of the different analogs that prior art existed that all allowed for distributed learning. Unlike in BASCOM, there was no non-computer version to do what BASCOM did. Here, there are lots of other ways to do this, and they're articulated in the background section of your patent. It's just you found a way that's a bit more efficient and a bit more successful at doing so. Not that I don't think that should be patent eligible, but under the body of law that I'm stuck living with, I don't see how that separates you from Ultramershal. Two points. With due respect, I would disagree with you as to BASCOM holding. It was a computerized system for content filtering. It was using computers. The software was either filtering content at the host computer, the ISP... But that's the point. It had no non-computer analog. You have lots of non-computer analogs. In art that I'm associated with, of course, but that's really turning Alice on its head. I mean, Alice is basically... Hey, nobody would like doing that more than me. You show me the patent. I understand, but we can do that. We're confident that these claims do do that, Your Honor. The analog here, and that's, again, that's what the district court had at stake here. The issue here was a technology improvement. I just need to direct the court back to column one of the patent, page 50. I mean, there is almost... There's more than half of a column talking about the complex technologies that had been developed to facilitate distributed learning. It talks about the satellite broadcast. It talks about specialized software. Yeah, and you know what? There used to be an abacus, and then there was a calculator, and now that math can be done on a computer much more efficiently. Still not patent eligible after Alice. And that's kind of like exactly what you have here. You're demonstrating the evolution of how human beings did exactly what you're doing now less efficiently than you've created a mechanism to do. It doesn't mean I don't think it's an invention. It just means that under the body of law, I don't see how you fall outside of the umbrella of everything that's been swept in under that Alice decision. Well, I feel like I'm repeating myself a little bit, but I'll just try and close with this. The point is it is not possible to do the solution that this patent claims in the pre-computer era. It's just not possible. That's the point. This is an improvement on technology that had already come up with a way to link people from thousands of miles away in a real-time interactive situation. Well, let's hear from the other side, and I'll restore some of your rebuttal time. Good morning. Jonathan Anderson for Chalk Outlays. When a student walks into a classroom, they can see the classroom. They can look around and see what it looks like. They can see the teacher. They can hear the teacher. They can see what the teacher is presenting,  And the student can see the teacher. The teacher can see the student. What Williamson has tried to do here is take that abstract idea of having a classroom interaction, a classroom with streams of data showing things in the classroom, and put it online. But they even acknowledge, to the last point, about not possible to do before. Not only are they taking that abstract idea and doing it online, there are already people, if you will, doing that abstract idea on computers. Could you characterize this case? I mean, I had been thinking about it a little bit, about this is a situation where it was maybe had been done on computers and with software that you had to give to somebody in a box on the computers, and now the Internet's created, and it's do it on the Internet? I think that's exactly right, and it's really do it on the web, I think is what they had in mind. When we look at the district court's claim construction on the instruction limitation that was referenced about pre-install, this is at 1107 through 1109, what the district court was getting at, we have these statements in the patent that say we're better because we don't use specialized software. And what we're going to use is just a standard web browser. They say in the patent, and the district court cited it on A1109 in its claim construction, we're using Netscape Communicator or Microsoft Internet Explorer is how they're going to receive this information. And that's the only disclosure of what's being run on these computers that are doing this. So what the district court was trying to capture with this construction was just the idea that it's not specialized software, it's just a web browser. And in fact, similarly for the server, when we look at the patent and where it describes this distributed learning server, at column five of the patent, starting around line 34, it's describing this distributed learning server, referring to figure three. Now, figure three itself only shows some black boxes. It doesn't tell us what the server does. But when we look further down, when it describes what this server is, it says it's simply running an operating system like Microsoft Windows or Sun Solaris, and it's using a standard web server, like Netscape Enterprise Server or the Apache Web Server. So it really is taking this idea, the abstract idea of a classroom, and saying we are better, we are different because we are putting it on the web. That's all this is under the current case. Well, it is better and different, right? It works better, you don't need to buy special software, everybody's got it. It is better and different. So doing something on the web does provide the benefits that the web provides. Absolutely true. I mean, computers calculate things faster than my calculator does, don't they? They absolutely do. And what we've learned from the recent body of case law  or do it on the web or do it on a computer, because computers are better and faster, that that is not something substantially more under the ALICE or significantly more under ALICE Step 2. So going back to the claims, and I think the other thing that I want to point out, there was a discussion about the server. When you look at Claim 1, for example, there is no server in that claim. Claim 1 says you're providing the instructions to two computers. It doesn't say what those instructions are, it doesn't say where they come from. In fact, it doesn't even say those instructions have to be executed. Really, this claim just says you're sending some instructions. That is exactly what computers have known how to do for at least decades. Similarly, for Claim 17, we have a server and we have these modules for doing various things, but those things that it's doing are the abstract ideas. The abstract idea is saying, let's have a classroom. Well, what is the classroom going to look like? We don't know. And in fact, not only do we not know, we have a situation here where we have the prior decision. We had a construction from the district court that required a pictorial map. And the court found in the prior decision that there was actually an explicit definition in the specification for the classroom location. And Williams & Surgin said it does not require a pictorial map. That in fact, the classroom only requires this partially virtual space where participants can interact. So I think we could fairly argue whether having a seating chart-like pictorial map adds anything substantial to the abstract idea. But certainly now, with this construction about simply having a virtual space for interaction with no guidance about what it looks like, that is simply the abstract idea of having a classroom. And then with the data stream similarly, it is simply not the case, when we look back at column 1 again, where Williamson describes the prior art, there's this talk about having two-way, in column 1 around line 41, two-way video and audio communication between the teacher at a broadcast center and audience members at one or more row of classrooms. So we see two things from this. First of all, it's two-way communication, so they can see and hear each other. So it's going both ways. And second, we have video and audio. And the patent says that, at least for claim 1, these at least two streams could be video or audio. And even if it's video, even in those prior systems, we had video going both ways. So when we look at Alice Step 1, we have simply this abstract idea of providing a classroom where you can see the participation, see the presenter, for example, see the whiteboard or chalkboard, or a video they may be showing. And of course, we have the limitation about the presenter can control what they show to the students. Well, the presenter in the real-world classroom can, of course, decide, do I want to show a video today, do I want to use the chalkboard? And then we get to Alice Step 2. The only thing that this patent even suggests that it provides is this idea of taking this abstract idea and putting it on the web, using web browsers and web servers. And the case that I would point to being most similar to the electric power group case had this idea of data streams in a way that I think is very similar to the data streams here. And the INRI TLI communications had a server for transmitting and recording digital images, putting that online. So the same kind of server aspect both found on patent from there. Anything else? Unless the court has any questions. Thank you, Your Honor. Okay. We'll restore two minutes of rebuttal time, please. Let me go right to Step 2. Because while I think most of the time we spent earlier was directed to whether there's an abstract concept, even if there was, Step 2, as applied by this court, especially most recently in the Baskin case, was addressing a district court decision that found that merely describing the interaction of computer components and software was not enough to add the inventive concept. And this court reversed that because the evidence was that the interaction of those computers was not routine or conventional. And these claims are very detailed. And I would ask that the court especially compare this case to electric power and TLI, both of which... TLI, for example, is simply a system that added classification information, a date, to a digital photograph that when it was stored would allow it to be stored in a folder with that date. I've been doing that since... I'm old enough to remember photos before the Internet. I've been doing that, looking at the date on the back of a photo and putting it in a folder with a particular date. That is not what happened here. I believe that to be the case. Here, we are talking about... even moving beyond step one, where, as I said, this is not pre-existing human activity brought to the Internet. Only technology can do distance learning. But even if you assume that we're talking about an abstract concept, looking at Baskin and looking at this case, they are precisely the same on the inventive concept and distinguishable, we believe, clearly distinguishable from electric power grid or TLI, because everything that could be used conventionally in Baskin, but it was being used unconventionally because of the existence on well-known pre-existing Internet filtering software in a computer network, but doing it remote from the host and doing it remote from the client. That's exactly what is happening here. And we suggest that this pattern, even if you go to step two about this, is clearly technological.